1
2
3
4
5
6
7          **UNITED STATES DISTRICT COURT**

8          **CENTRAL DISTRICT OF CALIFORNIA**

9

10   EDWARDO E.C.[1]              ) Case No. EDCV 19-1575-JPR
                                  )
11                    Plaintiff,  )
                                  )
12              v.                ) **MEMORANDUM DECISION AND ORDER**
                                  ) **AFFIRMING COMMISSIONER**
13   ANDREW SAUL, Commissioner    )
     of Social Security,          )
14                                )
                      Defendant.  )
15                                )
                                  )
16   _____

17   **I.    PROCEEDINGS**

18       Plaintiff seeks review of the Commissioner's final decision

19   denying his application for Social Security supplemental security

20   income benefits ("SSI").  The parties consented to the

21   jurisdiction of the undersigned under 28 U.S.C. § 636(c).  The

22   matter is before the Court on the parties' Joint Stipulation,

23   filed June 29, 2020, which the Court has taken under submission

24   without oral argument.  For the reasons stated below, the

25   _____

26        [1] Plaintiff's name is partially redacted in line with
27   Federal Rule of Civil Procedure 5.2(c)(2)(B) and the
     recommendation of the Committee on Court Administration and Case
28   Management of the Judicial Conference of the United States.

                                    1

Commissioner's decision is affirmed.

## II.   BACKGROUND

Plaintiff was born in 1976.  (Administrative Record ("AR") 169.)  He completed 12th grade and between 1995 and 2011 worked in demolition, selling gym memberships, stocking fresh produce, and in a warehouse.  (AR 198.)

On January 14, 2016, Plaintiff applied for SSI, alleging that he had been unable to work since July 7, 2015, because of "[a]nger problem, depression, mentally slow, schizophrenia," and "bipolar."  (AR 169, 196-97.)  He had applied for and been denied disability benefits four times prior.  (AR 65.)  After his application was denied initially, he requested a hearing before an Administrative Law Judge.  (See AR 64-76, 78-90, 92, 99-101.) A hearing was held on August 16, 2018, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert.  (See AR 43-63.)  In a written decision issued September 5, 2018, the ALJ found Plaintiff not disabled because he could perform his past relevant work or other work existing in significant numbers in the national economy.  (AR 25-27.)  He requested review from the Appeals Council, which denied it on June 28, 2019.  (AR 1-7.)  This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence

means such evidence as a reasonable person might accept as adequate to support a conclusion. <u>Richardson</u>, 402 U.S. at 401; <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is "more than a mere scintilla but less than a preponderance." <u>Lingenfelter</u>, 504 F.3d at 1035 (citing <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)).  "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." <u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1998).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's.  <u>Id.</u> at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for Social Security purposes if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   The Five-Step Evaluation Process

An ALJ follows a five-step sequential evaluation process to assess whether someone is disabled.  20 C.F.R. § 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must

determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.  § 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied.  § 416.920(a)(4)(ii) & (c).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  § 416.920(a)(4)(iii) & (d).

Before proceeding to step four, the ALJ must determine the claimant's residual functional capacity ("RFC").[2]  § 416.920(e); see also Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (ALJ assesses claimant's RFC between steps three and four). The fourth step requires that the ALJ determine whether the claimant's RFC is sufficient to perform past relevant work. § 416.920(a)(4)(iv).  When the claimant has no past relevant work, the Commissioner then bears the burden of establishing that he is not disabled because he can perform other substantial

---

[2] RFC is what a claimant can do despite existing exertional and nonexertional limitations.  § 416.945(a)(1); see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

1  gainful work in the national economy, the fifth and final step of

2  the analysis.  §§ 416.920(a)(4)(v), 416.960(c)(2); Drouin, 966

3  F.2d at 1257.

4       B.   The ALJ's Application of the Five-Step Process

5       At step one, the ALJ found that Plaintiff had not engaged in

6  substantial gainful activity since November 30, 2015.  (AR 20.)

7  At step two, she concluded that he had the severe impairment of

8  "schizophrenia."  (Id.)  At step three, she determined that his

9  impairments did not meet or equal a Listing.  (Id.)

10      Before reaching step four, the ALJ found that Plaintiff had

11 the RFC to perform

12           a full range of work at all exertional levels but with

13           the following nonexertional limitations: the claimant is

14           limited to performing simple, routine, repetitive tasks

15           with no high production quotas nor in a fast-paced work

16           environment, interaction with people should be no more

17           than superficial, any interaction with the public should

18           be  no  more  than  occasional,  and  he  would  be  most

19           successful working with objects rather than people.

20 (AR 22.)

21      At step four, she found him "capable of performing past

22 relevant work as a construction worker II and warehouse worker."

23 (AR 25.)  Alternatively and in light of the VE's testimony, at

24 step five she concluded that Plaintiff could successfully adjust

25 to other work, such as sugar-mold feeder, laundry checker, and

26 hand packer.  (AR 27.)  Accordingly, she found him not disabled.

27 (Id.)

28

**V.    DISCUSSION**

Plaintiff alleges that the ALJ improperly rejected treating-physician evidence from psychiatrist Inderjit Seehrai and his own subjective symptom testimony. (See J. Stip. at 5-11, 17-26.) For the reasons discussed below, the ALJ did not err.

A.    <u>The ALJ Properly Evaluated the Doctors' Opinions</u>

1.    <u>Applicable law</u>

Three types of physicians may offer opinions in Social Security cases: those who directly treated the plaintiff, those who examined but did not treat the plaintiff, and those who did neither. <u>Lester</u>, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's. <u>Id.</u>; <u>see</u> § 416.927(c)(2).[3] This is so because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th Cir. 1996). But "the findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other

_____

[3] For claims filed on or after March 27, 2017, the rules in § 416.920c (not § 416.927) apply. <u>See</u> § 416.920c (evaluating opinion evidence for claims filed on or after Mar. 27, 2017). The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." § 416.920c(a). Thus, the new regulations eliminate the term "treating source" as well as what is customarily known as the treating-source or treating-physician rule. <u>See</u> §§ 416.920c, 416.927(a), (c). Plaintiff's claim was filed before March 27, 2017, and the Court therefore analyzes it under the treating-source rule in § 416.927.

1  evidence in the record supports those findings." Saelee v.
2  Chater, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam) (as
3  amended).

4      The ALJ may disregard a physician's opinion regardless of
5  whether it is contradicted.  Magallanes v. Bowen, 881 F.2d 747,
6  751 (9th Cir. 1989); see Carmickle v. Comm'r Soc. Sec. Admin.,
7  533 F.3d 1155, 1164 (9th Cir. 2008).  When a doctor's opinion is
8  not contradicted by other medical-opinion evidence, however, it
9  may be rejected only for a "clear and convincing" reason.
10 Magallanes, 881 F.2d at 751; Carmickle, 533 F.3d at 1164 (citing
11 Lester, 81 F.3d at 830-31).  When it is contradicted, the ALJ
12 must provide only a "specific and legitimate reason" for
13 discounting it.  Carmickle, 533 F.3d at 1164 (citing Lester, 81
14 F.3d at 830-31).  The weight given a treating or examining
15 physician's opinion, moreover, depends on whether it is
16 consistent with the record and accompanied by adequate
17 explanation, among other things.  § 416.927(c)(1)-(6).  Those
18 factors also determine the weight afforded the opinions of
19 nonexamining physicians.  § 416.927(f)(1).  The ALJ considers
20 findings by state-agency medical consultants and experts as
21 opinion evidence.  § 416.927(e).

22     Furthermore, "[t]he ALJ need not accept the opinion of any
23 physician . . . if that opinion is brief, conclusory, and
24 inadequately supported by clinical findings." Thomas v.
25 Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson v.
26 Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).
27 An ALJ need not recite "magic words" to reject a physician's
28 opinion or a portion of it; the court may draw "specific and

7

1  legitimate inferences" from the ALJ's opinion.  <u>Magallanes</u>, 881

2  F.2d at 755.  "[I]n interpreting the evidence and developing the

3  record, the ALJ does not need to 'discuss every piece of

4  evidence.'"  <u>Howard ex rel. Wolff v. Barnhart</u>, 341 F.3d 1006,

5  1012 (9th Cir. 2003) (quoting <u>Black v. Apfel</u>, 143 F.3d 383, 386

6  (8th Cir. 1998)).

7       The Court must consider the ALJ's decision in the context of

8  "the entire record as a whole," and if the "'evidence is

9  susceptible to more than one rational interpretation,' the ALJ's

10  decision should be upheld."  <u>Ryan v. Comm'r of Soc. Sec.</u>, 528

11  F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

12            2.   <u>Relevant background</u>

13                 a.   <em>Examining Psychologists</em>

14       On February 18, 2011, clinical psychologist Clifford Taylor

15  examined Plaintiff for a prior benefits application, noting that

16  "[h]is effort level appeared suspect and the test results [we]re

17  considered to be of questionable validity."  (AR 279.)  Plaintiff

18  complained of forgetfulness, anger problems, depression,

19  confusion, "fatigue, problems with concentration and attention,

20  learning problems, alcohol problems, and speech and language

21  problems."  (AR 280.)  He was not taking psychotropic medications

22  and denied "any past or current mental health treatment services

23  or psychiatric hospitalizations."  (<u>Id.</u>)  After conducting a

24  complete psychological evaluation and administering various

25  tests, Dr. Taylor diagnosed an unspecified learning disorder,

26

27

28

noting an IQ of 57 and a GAF score of 65[4] (AR 282), but observed:

> The attained IQ and memory test scores [we]re considered invalid. There [wa]s no credible evidence of mental retardation based on his presentation and verbal comprehension. He performed below normal on the Test of Memory Malingering. He completed a four page history questionnaire form, dr[ove] himself as needed, worked in a warehouse and graduated from high school. His work and education history and his overall presentation [were] inconsistent with a Full Scale IQ score 57. [¶] His ability to maintain concentration and persistence and pace and adapt to work and job duties [wa]s mildly impaired. His ability to relate to coworkers, public and management [wa]s mildly impaired. [¶] The claimant would be unable to manage his own benefits based on his

---

[4] A GAF score of 65 indicates that Plaintiff had some mild symptoms or some difficulty in social, occupational, or school functioning but was "generally functioning pretty well" and had "some meaningful interpersonal relationships." See Diagnostic and Statistical Manual of Mental Disorders 32 (revised 4th ed. 2000). The Commissioner has declined to endorse GAF scores, Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50764-65 (Aug. 21, 2000) (codified at 20 C.F.R. pt. 404) (GAF score "does not have a direct correlation to the severity requirements in our mental disorders listings"), and the most recent edition of the DSM "dropped" the GAF scale, citing its lack of conceptual clarity and questionable psychological measurements in practice, DSM 16 (5th ed. 2013). Because GAF scores continue to be included in medical records, however, the Social Security Administration has clarified that they are "medical opinion evidence . . . if they come from an acceptable medical source." Wellington v. Berryhill, 878 F.3d 867, 871 n.1 (9th Cir. 2017) (citation omitted).

1      presentation.

2  (AR 282-83.)

3      Psychologist Margaret Donohue evaluated Plaintiff on

4  December 19, 2014, for a prior benefits application, about half a

5  year before the alleged onset date here.  (AR 287-91.)  He

6  complained of memory problems and bipolar disorder, "diagnosed at

7  age 19."  (AR 287.)  His primary-care physician had prescribed

8  Abilify, citalopram, hydroxyzine, and Seroquel.[5]  (AR 288.)  He

9  had never been seen by a psychiatrist but had "counseling because

10 of bipolar disorder and because he s[aw] shadows and hear[d]

11 voices."  (Id.)  He reported a suicide attempt with no associated

12 medical treatment; anxiety, nervousness, and nightmares;

13 occupation by a demon; and auditory hallucinations.  (Id.)  He

14 described "being in Special Day Classes from 6th to 12th grade"

15 and failing grades but that was "not . . . reflected" in the

16

17      [5] Abilify is the brand name for aripiprazole and "is
   indicated for manic and mixed episodes associated with bipolar I
18 disorder, irritability associated with autism spectrum disorder,
   . . . and as an adjunctive treatment of major depressive
19 disorder."  Aripiprazole, U.S. Nat'l Libr. of Med., https://
   pubchem.ncbi.nlm.nih.gov/compound/60795#section=Drug-Indication
20 (last visited Jan. 25, 2021).

21      Citalopram is used to treat depression.  Citalopram,
22 MedlinePlus, https://medlineplus.gov/druginfo/meds/
   a699001.html (last visited Jan. 25, 2021).
23
        Hydroxyzine is used to relieve anxiety and tension.  See
24 Hydroxyzine, MedlinePlus, https://medlineplus.gov/druginfo/meds/
   a682866.html (last visited Jan. 25, 2021).
25
        Seroquel is used to treat certain mental or mood conditions,
26 such as schizophrenia and bipolar disorder, as well as sudden
27 episodes of mania or depression associated with bipolar disorder.
   See Seroquel, WebMD, https://www.webmd.com/drugs/2/drug-4718/
28 seroquel-oral/details (last visited Jan. 25, 2021).

10

records.[6]  (Id.)  He had last worked as a stock clerk in a supermarket and reported that he could not remember the instructions he was given and quit.  (AR 289.)  He told Dr. Donohue that he had never been arrested or convicted of any crimes (id.), but in 2011 he had acknowledged to Dr. Taylor an assault-with-a-deadly-weapon conviction and two other arrests (AR 280), and at the hearing he mentioned a DUI (AR 48).  Dr. Donohue noted that his "[m]otor activity show[ed] intentional motor slowing," his "[i]nterview behavior show[ed] obvious signs of malingering," and "[b]ehavioral disturbance [wa]s the degree of malingering."  (AR 289.)  She diagnosed malingering and "[a]t [l]east [b]orderline [i]ntellect" and stated:

> **If this claimant is currently receiving benefits, the fraud unit needs to be contacted.** [¶] Based on today's assessment, the claimant would be able to understand, remember and carry out short, simplistic instructions with no difficulty if he was adequately motivated.  He should have no difficulty to make simplistic work-related decisions without special supervision.  He would have mild difficulty to make complex decisions because he forgets what he has stated previously.  He would have no difficulty to comply with job rules such as safety and attendance.  He should have no difficulty to respond to change in a normal workplace setting.  This examiner [wa]s not able to assess his ability to maintain persistence and pace in a normal workplace setting

---

[6] Indeed, in a Disability Report, Plaintiff apparently denied having been in special-education classes.  (See AR 198.)

because of intentional motor slowing. [¶] The claimant
present[ed] with no known history of interpersonal
difficulties. He malingered throughout the evaluation
with this examiner. This examiner [wa]s not able to
assess his ability to interact appropriately with
supervisors, coworkers and peers on a consistent basis.
The claimant is not able to manage finances on his own
behalf.

(AR 291 (emphasis in original).)

On September 14, 2016, clinical psychologist Julie Myers
provided a medical-source statement,[7] noting unspecified psychosis
"not due to a substance or known physiological condition" and
symptoms "stable" with "Risperidone" and "Coge[n]tin."[8] (AR 363.)
His prognosis was "guarded, condition chronic." (Id.) She noted
"mumbling to self; slow cognitive processing; poor immediate

---

[7] It is not clear what Dr. Myers's relationship with
Plaintiff was. She crossed out the word "your" from the phrase
"your patient" on the medical-source form in numerous places,
suggesting that he was not her patient. (AR 364-65, 367.) She
also wrote that she completed the statement "following review of
records and consultation with medical staff," noting that the
"client also completed a clinical interview with psychologist."
(AR 363.) Thus, it is not clear that Dr. Myers even examined
Plaintiff, but the Court assumes she did.

[8] Risperidone treats "schizophrenia," "acute manic or mixed
episodes associated with Bipolar I Disorder," and "irritability
associated with autistic disorder." Risperidone, U.S. Nat'l
Libr. of Med., https://pubchem.ncbi.nlm.nih.gov/compound/
5073#section=Drug-and-Medication-Information (last visited Jan.
25, 2021).

Congentin is the name-brand version of benztropine and is
used to treat involuntary movements caused by certain psychiatric
drugs. Congentin Tablet, WebMD, https://www.webmd.com/drugs/2/
drug-13533/cogentin-oral/details (last visited Jan. 25, 2021).

recall of three words . . . poor delayed 5 minute recall . . .
fixed stare; motor retardation; poor concentration . . . ; mental
confusion; disorganized thoughts; alogia;[9] no understanding of
metaphore [sic] . . . ; easily frustrated; no friends; socially
detached; hostility towards others; h[istory] of auditory and
visual hallucinations." (Id.)  Evaluating his functional
limitations, she found "[e]xtreme" "[d]ifficulties in maintaining
social functioning" and "[m]arked" "[r]estriction of activities
of daily living" and "[d]ifficulties in maintaining
concentration, persistence or pace." (AR 367.)

### b.    Treating Physician

Plaintiff was treated by Dr. Seehrai from March 30, 2015, to
June 27, 2018.  (AR 369.)  He complained of hallucinations and
paranoia, reported being molested once by a neighbor as a seven-
year-old, and was diagnosed with psychotic disorder and paranoid
schizophrenia.  (AR 303-04, 306, 314, 322.)  Starting at age 19,
he felt a negative "spirit come into . . . his body," heard
voices calling his name, and saw shadows and demons.  (AR 314.)
He reported five to six hours of sleep a night "disrupted" by
nightmares; changing moods; and feelings of hopelessness,
irritability, and anger.  (Id.)  Abilify was not helping, and Dr.
Seehrai increased his dosage of Zyprexa.[10]  (AR 304, 306.)  On

---

[9] Alogia is poverty of speech often associated with
schizophrenia.  Medical Definition of Alogia, MedicineNet,
https://www.medicinenet.com/alogia/definition.htm (last visited
Jan. 25, 2021).

[10] Zyprexa is the name-brand version of olanzapine, an
antipsychotic used to treat the symptoms of schizophrenia and
bipolar disorder.  See Olanzapine, MedlinePlus,

(continued...)

September 15, 2015, Plaintiff continued to report auditory hallucinations, and Dr. Seehrai prescribed Risperidone (AR 326), which appears to have been his only medication from February 2017 to at least August 2018 (see AR 373-86).

On April 12, 2016, Plaintiff reported that he had stopped taking diphenhydramine[11] because he was sleeping okay without it. (AR 343.)  He continued to have "low eye contact" and "disorganized thoughts." (Id.)  On June 27, 2016, Dr. Seehrai described his mood as "ok," with "fair eye contact" and "spontaneous" speech.  (AR 360.)  On February 10, 2017, Plaintiff reported that he was "doing alright" (AR 397), and at four appointments from April 27 through November 28, 2017, he reported that he felt "better" (AR 392-94, 396).  At his November 2017 appointment, he denied depression and anxiety, audio or visual hallucinations for the past month, paranoia, and anger or mood swings.  (AR 392.)  From January 16 to May 16, 2018, Dr. Seehrai reported that Plaintiff denied hallucinations and paranoia; was "doing fine now" with his medication; denied mood swings; had a "mellow" mood; kept his hallucinations "under control"; and had a good appetite and was sleeping.  (AR 388-91.)  Throughout Dr. Seehrai's treatment, nearly all of Plaintiff's mental-status examinations were almost entirely within normal limits, reflected

---

[10] (...continued) https://medlineplus.gov/druginfo/meds/a601213.html (last visited Jan. 25, 2021).

[11] Diphenhydramine, also known as Benadryl, is an antihistamine sometimes used to treat insomnia. Diphenhydramine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/ a682539.html (last visited Jan. 25, 2021.)

1   "fair" insight, and found him oriented in all categories.  (<u>See</u>
2   AR 304, 360, 387-99, 401; <u>but see</u> AR 317 (social worker
3   describing Plaintiff's insight and judgment as "poor," his mood
4   as "angry and depressed," and his affect as "irritable" and
5   finding him not oriented to "time" or "situation" on Mar. 12,
6   2015), 319-20 (Dr. Seehrai describing his behavior as
7   "aggressive/agitated" on May 12, 2015).)

8       A medical-source statement dated June 27, 2018, and signed
9   by Dr. Seehrai appears to have been at least partially completed
10  in Plaintiff's handwriting.[12]  (<u>See</u> AR 369; <u>compare</u> AR 231-38.)
11  It reflected a "guarded" diagnosis and extreme or marked
12  impairment in all areas.  (AR 369-71.)  It stated that Plaintiff
13  was not a malingerer and that alcohol or substance abuse
14  contributed to his limitations.  (AR 371.)

15      Another medical-source statement from Dr. Seehrai dated
16  August 18, 2018, reported a "guarded" diagnosis and "marked"
17  limitations in all areas except neatness and cleanliness, in
18  which his limitations were none or mild.  (AR 403-05.)   This
19  report claimed no alcohol or substance abuse and stated that
20  Plaintiff would miss "[a]bout three days per month" of work.  (AR
21  405.)

22              *c.   Consulting Reviewers*
23      Psychologist Helen C. Patterson[13] reviewed Plaintiff's
24

25      [12] In one spot the author wrote, in answer to a question
26  about side effects, "all are possible but I do not experience
    any" and then crossed out the word "I."  (AR 369.)

27      [13] Dr. Patterson specializes in psychology.  (<u>See</u> AR 74
28  (showing signature code 38)); Program Operations Manual System
                                                    (continued...)

records from February 2011 through April 2016, including those from his treating physician, and noted that he had the severe impairments of schizophrenia and other psychotic disorders. (AR 69-70.) In her assessment dated April 23, 2016, she referred "[a]ny reader to this record as a whole," noting that his primary-care physician observed that "cl[aimant] over time present[ed] w[ith] requests for notes from MD saying he ha[d] this and that problem." (AR 71.) Further, "inconsistencies [we]re demonstrated," and there was "no h[istory] of psychiatric admissions." (Id.) She found his symptom statements "not consistent" based on "[s]everal reports of malingering," "h[istory] of substance abuse," "[l]ack of objective evidence that signs of psychosis ha[d] been observed," and "[l]ack of any h[istory] of inpatient admissions." (AR 72.)

As to his RFC, she found that he "retain[ed] adequate capacity to complete tasks, follow instructions," and "maintain adequate attention, concentration, persistence and pace, as needed to sustain a normal workday and workweek." (AR 73.) She found his ability to interact with the general public "markedly limited" (id.), but he "retain[ed] adequate capacity for appropriate social interaction, as required in a normal work environment to respond appropriately to supervisor feedback and interact appropriately with co-workers" (AR 74).

In his June 27, 2016 assessment, state-agency physician P.M.

---

[13] (...continued)
(POMS) DI 24501.004, U.S. Soc. Sec. Admin. (May 15, 2015), https://secure.ssa.gov/apps10/ poms.nsf/lnx/0424501004 (signature code 38 indicates psychology).

Balson[14] noted schizophrenia and other psychotic disorders but found Plaintiff's statements about the "intensity, persistence, and functionally limiting effects of the symptoms" not "substantiated by the objective medical evidence alone." (AR 84-85.)  Dr. Balson cited "[s]everal reports of malingering," a history "of substance abuse," "[l]ack of objective evidence that signs of psychosis ha[d] been observed," and "[l]ack of any inpatient admissions." (AR 86.)  Regarding RFC, the doctor found only moderate limitation in Plaintiff's ability to complete a normal workday and workweek without psychologically based interruptions, but he was "markedly limited" in his ability to interact with the general public. (AR 87.)  As such, Dr. Balson found that he "retain[ed] adequate capacity for appropriate social interaction, as required in a normal work environment, to respond appropriately to supervisor feedback and interact appropriately with co-workers." (AR 88.)

> 3.   The ALJ's decision

The ALJ recounted Plaintiff's statements that he "did not spent [sic] time with others, ha[d] problems getting along with others and ha[d] gotten into fights with friends and neighbors, d[id] not like authority figures, and ha[d] difficulty handling stress." (AR 21.)  She observed that he claimed a limited attention span and said he had stopped working at the supermarket "because he began having problems with people there." (Id.)  He said his driver's license had been taken away because of

---

[14] Because there is no specialty code next to Dr. Balson's signature, his or her medical specialty is not clear. (See AR 88.)

1  schizophrenia, and he relied on his father or his bicycle for
2  transportation.  (Id.)

3       She noted that he said he had begun seeing Dr. Seehrai
4  because "he was hearing voices, seeing shadows, and had anxiety
5  issues."  (AR 22-23.)  He testified to "some improvement" but
6  would still see shadows and hear voices that encouraged self-harm
7  two or three times a week.  (AR 23; see also AR 52.)  He would
8  "lock himself in his room for the whole day whenever he
9  experienced these hallucinations" and often felt as if "people
10  were talking about him"; he was "unable to focus, and would
11  quickly forget" "names and directions."  (AR 23; see also AR 53.)
12  He also reported depression and anxiety, which "caused him to not
13  want to talk or interact with people."  (AR 23; see also AR 53-
14  55.)

15       He reported that he could perform personal care but
16  "lack[ed] motivation to do so, prepare[d] simple meals . . . ,
17  occasionally fe[d] his dog as a chore, . . . shop[ped] for simple
18  items, watche[d] television, and d[id] not spent [sic] time with
19  others."  (AR 23; see also AR 231-37.)

20       Recognizing that Dr. Donohue had examined Plaintiff in
21  December 2014, shortly before the period at issue, the ALJ noted
22  that he complained to her of bipolar disorder and memory problems
23  and had been prescribed psychotropic medications by his primary-
24  care provider but had "never been seen by [a] psychiatrist, and
25  had never been psychiatrically hospitalized."  (AR 23.)  She
26  noted the doctor's comment that although he reported receiving
27  mostly failing grades in school and being in special classes,
28  that was "not . . . reflected" in his records.  (Id.)  She

recounted that Dr. Donohue had remarked that he "showed intentional motor slowing" and "obvious signs of malingering in his interview behavior and behavioral disturbance." (Id.) She further reported the doctor's observations that he had poor recall, "claimed to not know the date," was unable to follow a three-part instruction, and "demonstrated a preoccupation with 'how mentally ill he [wa]s.'" (Id.) The ALJ noted that the doctor's chief diagnosis was "malingering." (Id.)

She reviewed treatment notes from Dr. Seehrai, reflecting that Plaintiff heard voices more at night, didn't get along with anybody, and had some trouble remembering to take his medications. (Id.) A medical-source examination by Dr. Seehrai on February 16, 2016, showed that he was "alert and oriented, had low eye contact, no motor retardation or agitation, with dysphoric mood and restricted affect, but . . . denied any current hallucinations." (AR 23-24, see also AR 344.) She noted that records from June 2016 through 2018 indicated improvement, including that "hallucinations had waned"; he was "doing alright" "on one medication now"; he was "feel[ing] better"; he had a "mellow mood"; and he "denied any depression or anxiety," "paranoia," "hallucinations," "anger," or "mood swings." (AR 24.)

The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record." (Id.) In support, she noted that his daily activities were not as limited as one would expect given the "complaints of disabling symptoms and limitations."

(<u>Id.</u>)  He could care for personal needs, prepare simple meals, feed his dog, go shopping, and watch television.  (<u>Id.</u>)  He also had some limited work activity after the alleged onset date.  (<u>Id.</u>)  Further, she cited "statements by doctors suggesting the claimant was engaging in possible malingering or misrepresentation," which, combined with a lack of compliance in taking medications, "suggest[ed] that the symptoms may not have been as limiting as the claimant has alleged."  (<u>Id.</u>)

Additionally, he had not "received the type of medical treatment one would expect for a totally disabled individual," getting psychotropic medications through his primary-care provider and never having been "psychiatrically hospitalized."  (AR 24-25.)  Treatment received had been "essentially routine and/or conservative in nature, consisting primarily of medications."  (AR 25.)  She further noted that the record reflected that "medications ha[d] been relatively effective in controlling [his] symptoms, with . . . his hallucinations, paranoia, and anger . . . all under control."  (<u>Id.</u>)

The ALJ gave "great weight" to the opinions of the state-agency psychological consultants and Dr. Donohue because they were "internally consistent" and "consistent with the record as a whole."  (<u>Id.</u>)  She also gave weight to the opinion of Dr. Taylor "to the extent that it [wa]s consistent with the opinions of Dr. Donohue and the State agency psychological consultants," noting, however, that it was "given well before the period at issue" and did not "consider the claimant's subsequent medical records."  (<u>Id.</u>)  She gave "only some weight" to the opinions of Drs.

Seehrai and Myers,[15] "who both opined that [his] symptoms were in the marked to extreme range of functional limitations, and that he was largely unable to meet competitive standards regarding his abilities to do unskilled work." (Id.)  She found the foregoing opinions "inconsistent with Dr. Seehrai's own treatment notes, which reflect[ed] medication compliance issues, but also improvement with medications to the point of resolution of [his] reported hallucinations and anger, and largely mild" examination findings.  (Id.)

Based on the VE's testimony and Plaintiff's work history, the ALJ found that he could perform his past work as a "construction worker II and warehouse worker, as generally and actually performed." (AR 25-26.)  She further found that he was capable of performing such alternative jobs as sugar-mold feeder, laundry checker, and hand packer. (AR 26-27.)

4.  Analysis

Unlike Drs. Donohue, Patterson, Balson, and Taylor, Dr. Seehrai found a "marked to extreme range of functional limitation" for Plaintiff in all areas. (AR 25.)  Because Dr. Seehrai's opinions were contradicted by those of other physicians, the ALJ needed to provide only a "specific and legitimate reason" for discounting them. See Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31).  As explained below, she did so, and remand is not warranted on this basis.

Inconsistency with the medical evidence, including a doctor's own treatment notes, is a specific and legitimate reason

---

[15] Plaintiff does not appear to challenge the ALJ's assessment of Dr. Myers's opinion. (See J. Stip. at 5.)

to discount a treating physician's opinion.  <u>See</u> <u>Tommasetti v.</u>
<u>Astrue</u>, 533 F.3d 1035, 1041 (9th Cir. 2008); <u>Connett v. Barnhart</u>,
340 F.3d 871, 875 (9th Cir. 2003) (physician's opinion was
properly rejected when his own treatment notes "provide[d] no
basis for the functional restrictions he opined should be
imposed"); <u>Rollins v. Massanari</u>, 261 F.3d 853, 856 (9th Cir.
2001) (ALJ permissibly rejected physician's opinion when it was
"implausible" and "not supported by any findings made by any
doctor," including her own); <u>see also</u> <u>Ford v. Saul</u>, 950 F.3d
1141, 1155 (9th Cir. 2020) ("An ALJ is not required to take
medical opinions at face value, but may take into account the
quality of the explanation when determining how much weight to
give a medical opinion.").

Dr. Seehrai's clinical records indicated a trend of
improvement over nearly 20 visits spanning a 26-month period
starting in April 2016, when Plaintiff reported sleeping better
without Benadryl and, despite some medication-compliance issues,
had fewer hallucinations and no paranoia or mood swings.  (<u>See</u> AR
23-24 (citing AR 342-45, 372-402).)  As the ALJ pointed out, the
"medications ha[d] been relatively effective in controlling
[Plaintiff's] symptoms" and he "report[ed] that his
hallucinations, paranoia, and anger were all under control."  (AR
25 (citing 372-402).)  Thus, she appropriately discounted Dr.
Seehrai's June and August 2018 opinions as inconsistent with his
own notes reflecting "improvement with medications to the point
of resolution" of Plaintiff's "hallucinations and anger, and

largely mild MSE findings."[16]   (AR 25.)   See Connett, 340 F.3d at 875; Rollins, 261 F.3d at 856.   Indeed, Dr. Myers is the only other doctor who assessed marked mental limitations, and she specifically noted that Plaintiff was not her patient; she worked in the same office as Dr. Seehrai and only reviewed his records, possibly interviewing Plaintiff once.   (See AR 363-68.)

Plaintiff claims it was error to credit Dr. Donohue's "stale one-shot examining opinion" from 2014 over those of his treating psychiatrist of several years.   (J. Stip. at 9-10.)   He further argues that nonexamining Drs. Patterson and Balson shouldn't be credited because they relied only on Dr. Donohue's opinion. (Id.)   But those arguments fail because their opinions, along with Dr. Donohue's, were "internally consistent" and "consistent with the record as a whole" (AR 25), and Dr. Seehrai's was not. See Thomas, 278 F.3d at 957 (finding that opinions of nontreating or nonexamining physicians provide substantial evidence when consistent with independent clinical findings or other record evidence); Tonapetyan v. Halter, 242 F.3d 1144, 1148-49 (9th Cir. 2001) (finding that examining physician's opinion alone constituted substantial evidence because it relied on independent

---

[16] As one example of the mild mental-status-exam results and how they did not support the limitations Dr. Seehrai assessed, Plaintiff apparently showed up for every appointment on time (see AR 325, 326, 327, 343, 344, 360, 387, 388, 389, 390, 391, 392, 393, 394, 395, 396, 397, 398, 399, 400, 401) and yet Dr. Seehrai found a "marked" limitation in his ability to "be punctual within customary full-time work tolerances" (AR 370).   Similarly, the doctor assessed a "marked" limitation in Plaintiff's ability to "adhere to basic standards of neatness and cleanliness" (id.) and yet all of the treatment notes show Plaintiff to be appropriately groomed (see AR 387, 388, 389, 390, 391, 392, 393, 394, 395, 396, 397, 398, 399, 400, 401).

examination of claimant).  And it's clear that Drs. Patterson and Balson both reviewed the entire record, including Dr. Seehrai's treatment notes, up to the dates of their assessments.  (See AR 69, 72, 84, 86.)

Moreover, the ALJ was required to consider all record evidence, including the reports from before the application date. See Tommasetti, 533 F.3d at 1041 (holding that "ALJ must consider all medical opinion evidence"); § 416.927(c) ("[W]e will evaluate every medical opinion we receive."); see also Williams v. Astrue, 493 F. App'x 866, 868 (9th Cir. 2012) (holding that ALJ erred in failing to consider medical opinions that predated alleged disability-onset date by several years but concluding that error was harmless) (citing Tommasetti, 533 F.3d at 1041).  Further, Dr. Donohue's report was made just a few months before the alleged onset date, and that date was chosen only because Plaintiff's prior applications alleging the same impairments for a number of years had been denied.  (See AR 65 (showing penultimate denial as occurring on July 3, 2015, four days before claimed onset date here).)

Indeed, Dr. Donohue's opinion was particularly relevant in light of her strong findings of malingering.  For example, in December 2014, Plaintiff complained to her of bipolar disorder and memory problems and reported that he was taking psychotropic medications, but those medications "had been prescribed by his primary care physician, . . . he [had] never been seen by [a] psychiatrist, and had never been psychiatrically hospitalized." (See AR 23 (citing AR 286-91).)  Dr. Donohue further observed that "although [he] reported receiving mostly failing grades in

school, as well as being in special classes," that was not reflected in his school records.  (AR 23 (citing AR 288).)  His "motor activity" showed "intentional slowing."  (AR 289.)  Her primary diagnosis was "malingering."  (AR 290.)  In her medical-source statement, she assessed that he would have little or no difficulty following instructions, making simple decisions, complying with workplace rules, and responding to changes, all consistent with Plaintiff's RFC.  (See AR 82, 291.)

Similarly, Dr. Patterson noted "contradictions" in the record, "requests for notes from MD saying he ha[d] this and that problem," no history "of psychiatric admissions," and a high-school "transcript showing C+ GPA" and not the failing grades Plaintiff claimed, and she indicated that he had "the mental capacity to sustain work-like activities in a non-public work setting."  (AR 70-71.)  Likewise, Dr. Balson's review assessed inconsistencies between Plaintiff's allegations and the medical-opinion evidence, several reports of malingering, and a lack of objective signs of psychosis or inpatient admissions.  (AR 86.) The inconsistencies between the foregoing evidence and Dr. Seehrai's conclusory 2018 opinions of extreme or marked functional limitations provided specific and legitimate reasons for discounting those opinions.[17]  See Maestas v. Berryhill, 692 F. App'x 868, 869 (9th Cir. 2017) (finding that doctor's opinion assessing functional limitations inconsistent with treatment notes and objective findings that were within normal limits was

---

[17] Dr. Seehrai's extreme assessed limitations were also inconsistent with his finding at every appointment that Plaintiff was able to handle his own medications.  (See, e.g., AR 387, 388, 389, 390, 391, 392, 393, 394, 395, 396, 397, 398, 399, 400, 401.)

entitled to "little weight"); <u>Baker v. Colvin</u>, No. 16-cv-01048-CAB (JMA), 2017 WL 2889302, at *11 (S.D. Cal. July 7, 2017) (ALJ properly discounted treating psychiatrist's opinion as inconsistent with clinical findings by examining psychiatrist, who found no significant cognitive defects), <u>accepted by</u> 2017 WL 3457189 (S.D. Cal. Aug. 11, 2017).

Plaintiff further contends that the ALJ improperly cherry-picked notes from Dr. Seehrai showing his improvement, ignoring other evidence demonstrating that his condition had at times deteriorated. (J. Stip. at 7-8.) He is correct that an ALJ must "review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." <u>Reddick</u>, 157 F.3d at 720. But the ALJ did so here. She gave a detailed recitation of the mental-health evidence, which was fairly limited, and carefully considered all of it. (<u>See</u> AR 22-25.)

And contrary to Plaintiff's allegations, Dr. Seehrai's treatment notes demonstrate a steady trend of improvement in his sleep, agitation level, eye contact, and mood and the waning of hallucinations. For instance, he reported sleep disturbances in March and August 2015 (AR 316, 327), but in February 2016 reported that he "sle[pt] a lot" (AR 344); stopped taking Benadryl in April 2016 because he was "sleeping ok w[ithout] it" (AR 343); had "ok" sleep and appetite in August and October 2016, February 2017, and April and June 2018 (AR 387, 389, 397, 399, 400) and "good" sleep and appetite in April, June, August, October 2017, and May 2018 (AR 388, 393, 394, 395, 396); there was only one report of "not sleep[ing]" in January 2018 (AR 391).

Similarly, he "presented as agitated, defensive and intimidating" in March 2015 (AR 314) and reported audio and visual hallucinations in March, May, August, and September 2015 and at all appointments in 2016 (AR 314, 319-20, 326, 327, 344, 360, 398, 399, 400), but then he reported "less" audio and visual hallucinations in February 2017 (AR 397); felt "better" and no longer believed "that somebody was touching" him in April 2017 (AR 396); reported no audio or visual hallucinations in June, August, and November 2017 and January through June 2018 (AR 387, 388, 389, 390, 391, 392, 394, 395), and with audio and visual hallucinations and paranoia described as "under control" in October 2017 and June 2018 (AR 387, 393).

The same improvement pattern is reflected in notes regarding his eye contact and tendency to become agitated, with "poor eye contact" noted from March through September 2015 (AR 317, 326) and "low eye contact" noted in February, April, and August 2016 (AR 327, 343, 344, 400), but then "fair" eye contact and behavior "within normal limits" noted in October 2015, June 2016, and at all appointments from October 2016 through November 2017 (AR 325, 360, 392-99). Indeed, "appearance/hygiene," "behavior," "mood/affect," "perceptual process," "thought process," "thought content," and "memory" were all "within normal limits" and insight and judgment were "fair" at every appointment from November 2017 through June 2018. (AR 387-92.)

The ALJ did not err in partially rejecting Dr. Seehai's opinions. Remand is not warranted.

27

B.   The ALJ Properly Evaluated Plaintiff's Subjective
     Symptom Statements

Plaintiff asserts that the ALJ failed to properly evaluate his subjective symptom statements.  (J. Stip. at 17-26.)  For the reasons discussed below, the ALJ did not err.

1.   Applicable law

An ALJ's assessment of a claimant's allegations concerning the severity of his symptoms is entitled to "great weight." Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended) (citation omitted); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24, 1986).  "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'"  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36; see also SSR 16-3p, 2016 WL 1119029, at *3 (Mar. 16, 2016).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  Lingenfelter, 504 F.3d at 1036 (citation omitted).  If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged."  Id. (citation omitted; emphasis in original). If the claimant meets the first test, the ALJ may discount the

claimant's subjective symptom testimony only if she makes
specific findings that support the conclusion. <u>See</u> <u>Berry v.</u>
<u>Astrue</u>, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent a finding or
affirmative evidence of malingering, the ALJ must provide a
"clear and convincing" reason for rejecting the claimant's
testimony. <u>Brown-Hunter v. Colvin</u>, 806 F.3d 487, 493 (9th Cir.
2015) (as amended) (citing <u>Lingenfelter</u>, 504 F.3d at 1036);
<u>Treichler v. Comm'r of Soc. Sec. Admin.</u>, 775 F.3d 1090, 1102 (9th
Cir. 2014).  The ALJ may consider, among other factors, the
claimant's (1) reputation for truthfulness, prior inconsistent
statements, and other testimony that appears less than candid;
(2) unexplained or inadequately explained failure to seek
treatment or to follow a prescribed course of treatment; (3)
daily activities; (4) work record; and (5) physicians' and third
parties' statements. <u>Rounds v. Comm'r Soc. Sec. Admin.</u>, 807 F.3d
996, 1006 (9th Cir. 2015) (as amended); <u>Thomas</u>, 278 F.3d at 958-
59 (citation omitted).  If the ALJ's evaluation of a plaintiff's
alleged symptoms is supported by substantial evidence in the
record, the reviewing court "may not engage in second-guessing."
<u>Thomas</u>, 278 F.3d at 959.

      2.   <u>Relevant background</u>

In his February 2, 2016 function report, Plaintiff stated
that he became paranoid around people, felt that they laughed and
stared at him, and sometimes wanted to fight them.  (AR 231.)  He
also had memory difficulties and trouble sleeping.  (<u>Id.</u>)  His
daily activities were watching television, going outside and
watching the cars pass, taking his pills, sometimes fighting with
his parents, and sleeping.  (AR 232.)  He reported nightmares as

well as spirits and black shadows that would come into his room and laugh and point at him.  (Id.)  He fought with family and a neighbor and lost all of his friends.  (AR 236.)  He had difficulty concentrating and remembering things and didn't like authority figures.  (AR 236-37.)

At his hearing, he testified that he lived with his parents and last worked regularly in 2011.  (AR 47-48.)  In 2016 and 2017, he participated in clinical trials for compensation and earned about $5000 each year.  (AR 49-50; see also AR 187 (showing wages in 2016 of $5227 and in 2017 of $4852).)  He couldn't look for other work because the DMV had taken his driver's license away on account of his schizophrenia.  (AR 51.)[18] He started seeing Dr. Seehrai because he "was hearing voices and seeing shadows, and had anxiety problems."  (AR 52.)  He reported that although there was "a little bit" of improvement with treatment, two or three times a week he still saw two shadows "in particular" and heard "voices that cuss[ed him] out and t[old] him . . . to kill [him]self."  (Id.)  That made him "nervous and scared," and he would lock himself in his room for the whole day. (AR 53.)  This affected his ability to get along with his family, and he had no friends.  (Id.)  He also reported poor memory and focus as well as depression and suicidal thoughts weekly.  (Id.) He sometimes would forget to take his medications, but his mother would remind him to do so.  (AR 54.)  He testified that he had

---

[18] In February 2016, Plaintiff reported that he didn't drive because his "car brok[e] down."  (AR 234.)

1  been in special-education classes from sixth to 12th grade.[19]  (AR
2  55.)  He read slowly and couldn't remember things or concentrate.
3  (AR 56.)

        3.  <u>Analysis</u>

5       Plaintiff asserts that the ALJ "must consider *all relevant*
6  *evidence* in the record" (J. Stip. at 17 (emphasis in original))
7  and that the "absence of sufficient articulated rationale is
8  itself legal error warranting remand" (<u>id.</u> at 18).  But he can't
9  have it both ways; consideration of all record evidence must
10 include the evidence of malingering, which he doesn't mention
11 anywhere in his portion of the Joint Stipulation; his daily
12 activities; and his improvement with treatment.  On those
13 grounds, his subjective symptom testimony was properly
14 discounted.

        a.  *Malingering*

16      As an initial matter, Plaintiff has not discussed or
17 contested the ALJ's reliance on the evidence of malingering,
18 which, as explained below, fully supports her discounting of his
19 subjective symptom statements.  By failing to do so, he
20 implicitly concedes its legitimacy.  <u>See</u> <u>Arlene R.M. v. Comm'r of</u>
21 <u>Soc. Sec.</u>, No. 17-CV-370-FVS, 2019 WL 267912, at *5 (E.D. Wash.
22 Jan. 18, 2019) (rejecting plaintiff's argument that her
23 "credibility" was "bolstered" by certain evidence when she
24 "fail[ed] to address the reasons cited by the ALJ or demonstrate
25 any error").  For that reason alone, remand is not warranted on

27 ─────────────────
28      [19] As noted, in his Disability Report, Plaintiff apparently
   denied having been enrolled in special-education classes.  (<u>See</u>
   AR 198.)

1  this claim.  In any event, as discussed later, the other reasons
2  the ALJ gave for discounting Plaintiff's statements were clear
3  and convincing and fully supported by the record.

4       The ALJ permissibly discounted Plaintiff's symptom
5  statements based on affirmative evidence of malingering.  Indeed,
6  after administering a variety of tests, including some designed
7  specifically to assess malingering, Dr. Donohue made a primary
8  diagnosis of malingering.  (See AR 291 ("If this claimant is
9  currently receiving benefits, the fraud unit needs to be
10 contacted.")); cf. Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d
11 685, 693 (9th Cir. 2009) (requiring only "affirmative evidence"
12 of malingering (citation omitted)); Flores v. Comm'r of Soc.
13 Sec., 237 F. App'x 251, 252–53 (9th Cir. 2007) (same).  That Dr.
14 Donohue's assessment was shortly before the relevant time period
15 doesn't matter because it plainly demonstrates a pattern and
16 history of malingering concerning the same symptoms he alleges
17 now.  See John B. v. Saul, No. 4:19-CV-05126-JTR, 2020 WL
18 5745818, at *8 (E.D. Wash. Aug. 5, 2020) (rejecting plaintiff's
19 objection to assessments predating relevant time period and
20 finding pattern of exaggerating symptoms established by
21 substantial evidence).

22      In addition, Drs. Patterson, Balson, Donohue, and Taylor
23 noted "requests for notes from MD saying he has this and that
24 problem" (AR 71, 84); inconsistencies between his statements and
25 treatment records (AR 71, 84, 86); inconsistencies between his
26 statements and school records (AR 71, 85); no history of
27 psychiatric admissions (AR 71, 84, 280, 288); and below normal
28

scores of 22 and 25 on the Test of Memory Malingering[20] (AR 281-
83).  As the foregoing constitutes affirmative evidence of
malingering, the ALJ was entitled to reject Plaintiff's testimony
on that basis alone.  See Valentine, 574 F.3d at 693; Flores, 237
F. App'x at 252-53; see also Tonapetyan, 242 F.3d at 1148
(finding that symptom exaggeration is valid basis for discounting
symptom testimony).

b.   *Daily Activities*

An ALJ also may properly discount a plaintiff's subjective
symptom statements when they are inconsistent with his daily
activities.  See Molina, 674 F.3d at 1112.  "Even where those
[daily] activities suggest some difficulty functioning, they may
be grounds for discrediting the claimant's testimony to the
extent that they contradict claims of a totally debilitating
impairment."  Id. at 1113.  The ALJ here noted that Plaintiff
"c[ould] care for personal care needs, prepare[d] simple meals, .
. . fe[d] his dog, [went] shopping for simple items, and
watche[d] television" — and performed "work activity" during the
clinical trials in which he participated — suggesting that his
"daily activities ha[d], at least at times, been somewhat greater
than [he] ha[d] reported."  (AR 24); see Reddick, 157 F.3d at 722
(ALJ may discount subjective symptom statements when "level of

---

[20] This is a visual-recognition test designed to help
mental-health practitioners distinguish between true and feigned
memory impairments.  See Test of Memory Malingering (TOMM),
Criminal Justice, http://criminal-justice.iresearchnet.com/
forensic-psychology/test-of-memory-malingering-tomm/ (last
visited Jan. 25, 2021).  "[A]ny score lower than 45 should raise
concern that an individual is not putting forth the maximum
effort and is likely malingering."  Id.

1  activity [is] inconsistent with Claimant's claimed limitations").

2  Her reliance on this evidence was proper.  See Bray v. Comm'r of

3  Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (affirming

4  ALJ's rejection of symptom allegations as inconsistent with

5  claimant's recent work and search for other employment); Fair,

6  885 F.2d at 604 (finding that ALJ properly relied on daily-

7  activity testimony that plaintiff "remain[ed] capable of caring

8  for all his own personal needs, the performance of his own

9  routine household maintenance and shopping chores, riding public

10  transportation, and driving his own automobile").

11              c.  *Objective Medical Evidence*

12      Contradiction with evidence in the medical record is a

13  "sufficient basis" for rejecting a claimant's subjective symptom

14  testimony.  Carmickle, 533 F.3d at 1161; see Morgan v. Comm'r of

15  Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (upholding

16  "conflict between [plaintiff's] testimony of subjective

17  complaints and the objective medical evidence in the record" as

18  "specific and substantial" reason undermining credibility).

19  Although a lack of medical evidence "cannot form the sole basis

20  for discounting pain testimony, it is a factor that the ALJ can

21  consider in his credibility analysis."  Burch v. Barnhart, 400

22  F.3d 676, 681 (9th Cir. 2005).

23      As discussed above, the objective medical evidence showed a

24  trend of improvement over time with treatment and the

25  normalization of Plaintiff's medication regimen.  (See AR 373-

26  401); see also § 416.929(c)(3) (stating that claimant's

27  medications and treatment are relevant to assessing symptom

28  allegations).  And as the ALJ noted (AR 25), Plaintiff's periods

34

of improvement coincided with his medication compliance.  See

Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th

Cir. 2006) ("Impairments that can be controlled effectively with

medication are not disabling for the purpose of determining

eligibility for SSI benefits.").[21]  The most recent of Dr.

Seehrai's treatment notes, for 2017 and 2018, showed that

Plaintiff's condition had stabilized such that his mental-status

exams were consistently within normal limits, with fair insight

and judgment and full orientation.  (See AR 387-97.)

As required, the ALJ identified which of Plaintiff's

statements were inconsistent with cited record evidence

undermining his symptom complaints.  Brown-Hunter, 806 F.3d at

493; Reddick, 157 F.3d at 722.  She did not err in discounting

Plaintiff's subjective symptom statements.

**VI.  CONCLUSION**

Consistent with the foregoing and under sentence four of 42

U.S.C. § 405(g),[22] IT IS ORDERED that judgment be entered

---

[21] The ALJ may have erred in finding Plaintiff's treatment
with antipsychotic medication to be "routine and/or conservative
in nature."  (AR 24-25.)  But even if she was wrong, see, e.g.,
Childress v. Colvin, No. EDCV 14-0009-MAN., 2015 WL 2380872, at
*14 (C.D. Cal. May 18, 2015) (finding treatment of prescription
antidepressants and antipsychotics and talk therapy not properly
characterized as conservative), she did not err in concluding
that it was largely effective.  Moreover, as discussed above, the
ALJ gave other legally sufficient reasons for partially
discounting Plaintiff's credibility.

[22] That sentence provides: "The [district] court shall have
power to enter, upon the pleadings and transcript of the record,
a judgment affirming, modifying, or reversing the decision of the
Commissioner of Social Security, with or without remanding the
cause for a rehearing."

AFFIRMING the Commissioner's decision and DENYING Plaintiff's
request for remand.


DATED:  __January 26, 2021__        _____
                                     JEAN ROSENBLUTH
                                     U.S. Magistrate Judge

36